EXXON CORPORATION, successor by merger to Esso International, Inc., Plaintiff-Appellee,

v.

A. L. BURBANK & COMPANY, LTD., Defendant-Appellant,

and

United States of America, Defendant-Appellee.

No. 177, Docket 74–1649.

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1974.

Decided Jan. 31, 1975.

Paul F. McGuire, New York City (Kirlin, Campbell & Keating, New York City, on the brief), for plaintiff-appellee.

Alfred A. Meyer, New York City (Burke & Parsons, New York City, on the brief), for defendant-appellant.

Warren A. Schneider, Atty., Admiralty & Shipping Section, U. S. Dept. of Justice, New York City (Paul J. Curran, U. S. Atty., S. D. N. Y., Carla A. Hills, Asst. Atty. Gen., U. S. Dept. of Justice, Gilbert S. Fleischer, Atty. in Charge, Admiralty & Shipping Section, U. S. Dept. of Justice, New York City, on the brief), for defendant-appellee.

Before FEINBERG and MULLIGAN, Circuit Judges, and BRYAN,* District Judge.

MULLIGAN, Circuit Judge:

On or about March 5, 1965 Exxon Corp. and A. L. Burbank and Co., Ltd., operating agent for various seafaring vessels, entered into a contract which provided that Exxon would sell fuel oil to Burbank for the remainder of the calendar year 1965. Accordingly, in October 1965 a quantity of fuel oil was delivered by Exxon in Venezuela to the S. T. Atlas, for which vessel Burbank was acting as operating agent. The amount due Exxon for this oil delivery, $22,006.00, was never paid, and this arrears has prompted the instant litigation.

The registered owner of the Atlas from August 27, 1958 until her judicial sale on March 10, 1966 was at all times Tankers & Tramps Corp. (Tankers). The Atlas was constructed pursuant to Title XI of the Merchant Marine Act, 46 U.S.C. § 1271 et seq., whereby the United States government, acting through its Maritime Administrator (Maritime), insured payment of the unpaid balance of the vessel's purchase price. More specifically, this meant that the first preferred mortgage and its accompanying promissory note, held by the Bowery Savings Bank, were insured by the federal government.

On September 26, 1960 this mortgage was transferred to the Irving Trust Co. (Irving); simultaneously, Tankers issued to Irving additional bonds, to replace the original promissory note, and these bonds too were federally insured.

On August 9, 1963 Tankers gave the government a new promissory note, in consideration of a government loan constituting the amount of a mandatory redemption of its bonds; to secure payment of this note, Tankers executed in the government's favor a second preferred mortgage on the Atlas.

On November 4 of the same year Tankers and the government's Military Sea Transportation Service (MSTS) entered into a written charter agreement, signed by defendant Burbank as agent for Tankers, whereby the Atlas was chartered to the United States for a minimum of 5 years; this charter was in force at the time of the fuel-oil sale that is the subject of this action. Under the terms of the charter the anticipated rate for fuel oil was included in a freight rate to be paid by MSTS; in case of a rise in fuel-oil prices, a corresponding rise in the freight rate was provided for.

On July 1, 1964 Tankers and Burbank entered into an agency agreement concerning the Atlas's operation. Pursuant to this agreement an account was established at Irving ("payment account") to receive the earnings of the vessel, i. e., freight paid by the government under the charter, and from which Burbank could withdraw the funds needed to pay the Atlas's operating expenses, including, naturally, fuel oil.

Approximately a year later, Tankers, being unable to make the payment necessary to redeem certain bonds due, successfully applied to Maritime for an advance loan of $276,000.00, and to Irving for an advance loan of $325,000.00. Consequently, on July 26, 1965, contracts were executed between Tankers and Maritime (contract No. MA–3927), and Tankers, Irving, and the government (contract No. MA–3928). The latter is excerpted in significant part in the margin.[1]

* United States District Judge for the Southern District of New York, sitting by designation.

1. "That, in consideration of Maritime making the Maritime Advance and Irving making the Irving Advance. . . . and in order to further secure the repayment to Irving of the Irving Advance and to Maritime of the Maritime Advance, the parties hereto for themselves, their successors and assigns hereby covenant and agree as follows:

1. That the Assignment and all monies received thereunder or in respect thereof and held by Irving until applied as herein provided shall be and remain as security, (a) for the Irving Advance until the Irving Advance has been paid in full and (b) for the Maritime Advance, subject to the prior payment in full of the Irving Advance, until the Maritime Advance has been paid in full.

\* \* \* \* \* \*

In accordance with the latter contract a "cash collateral" account was set up at Irving to receive the earnings of the Atlas, out of which the advances from Irving and Maritime could be repaid. Burbank, as the ship's agent, had no authority to withdraw funds from this account for the ship's operating expenses, but rather had to submit statements for expenses to Maritime for approval; if approval was forthcoming, funds would be transferred from this account to the other "payment" account at Irving, discussed *supra*, from which Burbank could make payment. There was testimony which indicated that Maritime's approval was routinely given for operating expenses.

In October 1965 Irving was repaid in full for its advance to Tankers.

In December of the same year Burbank sought transfer of $40,948.65 from the "collateral" account to the "payment" account, so that Burbank could pay off certain operating expenses, including the fuel-oil bill from plaintiff. However, on January 6, 1966 and without prior notice to Burbank, Maritime withdrew $210,000.00 from the collateral account to be applied toward repayment of the still-outstanding Maritime advance. This withdrawal so depleted the collateral account that insufficient funds remained to pay off the operating expenses charged, including plaintiff's fuel-oil bill.

Exxon sued both Burbank and the federal government in order to secure payment for the oil. The case was tried before the Hon. Robert L. Carter in the Southern District of New York, who, on March 14, 1974, rendered judgment for plaintiff against Burbank for $31,111.00, inclusive of interest, plus costs; plaintiff's suit against the United States, and a cross-claim by Burbank against the United States, were both dismissed.

■ Burbank now appeals solely from that part of the judgment that dismissed its cross-claim against the government. It is now undisputed that plaintiff is to be paid for its fuel oil; the only unresolved question is whether Burbank or the government is to pay.

Essentially, Burbank contends that it was inequitable for the United States to pay itself for its maritime advance out of the "collateral" account without first taking care of all operating expenses for which Burbank had not been reimbursed. In this regard Burbank reads contract No. MA–3928 to allow repayment of the Maritime advance only after payment of the ship's operating expenses.

We do not agree. It is clear from the plain language of the contract that Maritime had sole discretion as to how the funds were to be applied. The contract reads in pertinent part:

> Irving shall retain and hold each such payment of charter hire or other monies until Maritime shall have determined the amount (*if any*) to be paid to the Company [Tankers] (or its agent [Burbank]) for the continued current operation of the Vessel; and . . . Irving shall disburse such payment of charter hire or other monies to Maritime and/or the Company

3. That after the Irving Advance has been paid in full (i) Irving shall immediately upon receipt by it of each payment of charter hire or other monies under the Assignment advise Maritime in writing of the date and type of payment, amount, and such other information as Maritime may reasonably request with respect thereto; (ii) Irving shall retain and hold each such payment of charter hire or other monies until Maritime shall have determined the amount (if any) to be paid to the Company (or its agent) for the continued current operation of the Vessel; and (iii) Irving shall disburse such payment of charter hire or other monies to Maritime and/or the Company (or its agent) and in such amount as Maritime shall direct. . . .

4. The Company hereby authorizes, directs and empowers, Irving and Maritime respectively to apply any and all charter hire and other monies received under the Assignment to payment or prepayment of the Irving Advance and to payment or prepayment of the Maritime Advance respectively."

(or its agent) and in such amount as *Maritime* shall direct. . . .

The Company hereby authorizes, directs and empowers, Irving and Maritime respectively to apply any and all charter hire and other monies received under the Assignment to payment or prepayment of the Irving Advance and to payment or prepayment of the Maritime Advance respectively. (emphasis added).

From this language we can discern no contractual obligation on the part of the government to pay out for any operating expenses first, before retiring the debt owed to it.[2] Indeed, the express purpose of contract No. MA–3928 was "to further secure the repayment to Irving of the Irving Advance and to Maritime of the Maritime Advance," rather than to insure the payment of the Atlas's expenses.

■ Therefore it appears that Maritime had every contractual right to take the action it did. In reply Burbank asserts that Maritime should be equitably estopped from paying itself before paying expenses because, in the past and as a matter of routine, Maritime always approved requests for reimbursement of expenses.

We disagree. Prior to Maritime's action to repay its own advance, the Atlas had fallen into a precarious financial position, a fact that was known (or should have been known) to Burbank; therefore, the latter should have expected that Maritime, at any future time and in accordance with the express terms of the contract, would abandon any routine approval of expense requests and protect its own investment by using the funds to repay its advance. In fact shortly thereafter the vessel was arrested in a foreclosure libel filed by the government.

Affirmed.

---

**2.** To this extent we disagree with the opinion of Judge Carter below, when he says: "Pursuant to these contracts the owner agreed to apply all monies it received, *except those for* operating expense, to pay its indebtedness to Irving and the government" (emphasis added). We can find no such exception within the four corners of the contract.